Filed 5/4/22  P. v. Harper CA1/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DERRICK DAMON HARPER,<br><br>      Defendant and Appellant. | A153332<br><br>(Contra Costa County<br>Super. Ct. No. 51617695) |

**INTRODUCTION**

Defendant Derrick Damon Harper and Joseph Bradshaw were charged and tried in a joint trial before separate juries for felony murder (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)), and accompanying gang and firearm enhancements (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b), (d), (e)(1)).[1] Additionally, it was alleged defendant had suffered two prior felony convictions for kidnapping (§§ 207, subd. (a), 667, subds. (a)(1), (d)-(e), 1170.12, subds. (b)-(c), 667.5, subd. (a)).  Midway through trial, the court granted defendant's request to represent himself and appointed standby counsel.

---

[1] All undesignated statutory references are to the Penal Code unless otherwise stated.

1

The jury convicted defendant of first degree felony murder, and found true the firearm and gang enhancements.[2] The trial court determined that defendant's prior convictions qualified as strikes, that he committed two prior serious felonies, and that he had served two prior prison terms. The trial court denied defendant's new trial motion and sentenced him to life without the possibility of parole, plus 116 years to life. This sentence was ordered to be served consecutively to the term of 287 years to life that was imposed by a different judge in an earlier trial.[3]

Defendant appealed, contending the trial court denied him a fair trial by refusing to grant him a separate trial from Bradshaw; failing to bifurcate the gang allegations; admitting evidence of defendant's prior offer to plead guilty; not instructing the jury that testimony of in-custody witnesses should be viewed with caution; failing to properly instruct the jury regarding the testimony of an in-custody witness who qualified as an informant as a matter of law; and refusing to order the trial witnesses not to discuss their testimony with each other. Defendant claimed the cumulative effect of these errors deprived him of a fair trial. Additionally, defendant argued the trial court erred by excusing his jury without advising him of his right to have the jury determine his prior convictions and without obtaining a waiver of this right. Finally, defendant raised numerous sentencing errors.

In our prior opinion in this appeal filed September 29, 2021, we affirmed the judgment but remanded for resentencing. The Supreme Court

---

[2] The trial court declared a mistrial in Bradshaw's case after the jury declared it was unable to reach a verdict. Bradshaw was not a party to the appeal.

[3] On January 9, 2020, we issued an opinion in that earlier case (A152284), affirming the judgment and remanding for resentencing. (*People v. Harper* (2020) 44 Cal.App.5th 172.)

2

granted review, vacated our opinion, and transferred the matter back to us for reconsideration in light of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699) (Assembly Bill 333). The new law amends section 186.22 by redefining key terms and requiring additional elements to establish a criminal street gang enhancement such as the one found true against defendant. Assembly Bill 333 also resulted in the enactment of section 1109, which provides that, upon request of the defendant, a gang enhancement shall be tried after the defendant's guilt on the underlying offense has been determined. (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.)

The parties agree that reversal of the gang enhancement is necessary in light of the retroactive effect of the ameliorative provisions of section 186.22. Defendant further contends that newly enacted section 1109 also applies retroactively, and his murder conviction should be reversed and the matter remanded for a new trial governed by the new bifurcation provision of that section. The Attorney General argues section 1109 does not apply retroactively, and, although the gang enhancement must be vacated, defendant is not entitled to a new trial on his murder conviction based on the new law. We conclude we need not determine whether section 1109 should be applied retroactively because any error in trying the substantive counts with the gang enhancement in this case was harmless.

We shall affirm defendant's conviction for first degree felony-murder and reverse the true finding on the associated criminal street gang enhancement. We will remand to provide the prosecution an opportunity to retry the criminal street gang enhancement. The cause is further remanded for resentencing consistent with this opinion. In all other respects, we affirm the judgment.

# FACTUAL BACKGROUND

## A.  *The Murder*

On the morning of August 14, 2008, police were called to a shooting at a residence on Heights Avenue in Pittsburg.  The responding officers arrived around 7:20 a.m.  Two men at the house, John Wilson and Harry Scott Moser, directed the officers to a bedroom where they found the victim, Jesse Saucedo, lying on a mattress on the floor.  Saucedo had a gunshot wound to the head and was lying on his right side with his right arm extended out and his head resting on it.  A bullet fragment was 10 inches from his head.  Saucedo was taken to the hospital, where he later died.

There was no sign of forced entry to the front door of the house.  Saucedo's wallet, watch, and ring had not been taken from him, but his laptop computer was missing.

## B.  *Witnesses at the Scene on August 14, 2008*

Moser lived at the Heights Avenue house and rented rooms to Wilson and codefendant Bradshaw.  On the morning of the murder, Moser woke up around 7:30 a.m.  He saw Bradshaw in the kitchen, who appeared panicky and said, " 'I didn't do it.' "  Moser walked out to the hallway and saw a man bleeding from a gunshot wound to the head in one of the bedrooms.  There were a lot of other people around, including a Black man and some women.  Moser yelled to Wilson, who was in the back bedroom, to call the police, and told everyone else to get out.  When the police arrived, Moser and Wilson were the only people at the Heights Avenue house.

Moser had not heard a gunshot nor did he see anyone with a gun after he saw the body.  Moser acknowledged there was drug activity going on in his house at the time and that he sometimes traded drugs for rent.  Moser had previous convictions for domestic violence and corporal injury on a child.

4

District attorney homicide inspector John Conaty testified that on the morning of August 14, 2008, Moser told him that defendant was in his house at the time he found the body in Bradshaw's bedroom.

In the early morning hours of August 14, Deana Castro was smoking drugs with Bradshaw at Moser's house. She later went to sleep in an empty bedroom. At some point, she woke up and used the bathroom. She then laid back down and heard a gunshot about a minute later. Moser and Bradshaw came to the bedroom door, and Moser told her to leave. As she was leaving, Castro saw a person lying on the ground in a pool of blood in the front room. Bradshaw, Moser, Wilson, and defendant were in the hallway. Defendant had a gun in his waistband.

Castro did not initially tell the police about the gun because she was dating defendant at the time and she feared retaliation for being a snitch. Castro also told police that after the gunshot she heard Bradshaw say, " 'Don't shoot me. I promise I won't tell.' " Castro had three prior convictions, two for theft-related offenses and one for possession of methamphetamine for sale. At the time of trial, she was in drug rehabilitation and had been clean for 90 days.

## C. *Events Leading Up to The Murder*

Saucedo was a mid-level methamphetamine dealer. Alicia Hammond, who testified she had been best friends with Saucedo, said he was openly gay. Saucedo and Hammond used methamphetamine together and she sometimes drove him to make deliveries. Saucedo regularly sold methamphetamine to Bradshaw and referred to him as his cousin.

Hammond received a text from Saucedo early in the morning on August 13, 2008, asking her to pick him up from the house of their mutual friend, Valerie Vera, in Antioch. Hammond arrived around 5:00 or 6:00 a.m.

Saucedo, Vera, Joey Gaeta, and Opi (Robert Lexer) were there, hanging out in the garage. At some point, Bradshaw, who was not part of their group, arrived. He appeared "antsy" and anxious to leave. Bradshaw began talking about a flat screen television at his house that he wanted to sell to Saucedo. He asked Saucedo to go with him to his house to see it, but Saucedo said he wanted to go to Hammond's house.

The group, including Bradshaw went to Hammond's house. They all hung out in Hammond's room and smoked methamphetamine. Bradshaw was nervous and pacing. Eventually, he left on his own to go home.

At some point, Hammond needed to leave for an appointment. Gaeta agreed to drop off Saucedo at Bradshaw's house. Saucedo was carrying a bag containing his laptop computer and his cell phone. Hammond said she would pick up Saucedo from Bradshaw's house after her appointment, but when she called him later he did not answer his phone. Gaeta told her later that day that Saucedo had been killed.

Hammond had felony convictions for car theft, petty theft, and receiving stolen property. At the time of the murder, she was on methadone for her heroin use and smoked methamphetamine daily. At the time of trial in 2017, Hammond had been clean for five and a half years.

## D.   *Defendant's Conduct After the Murder*

Carmen Weathers had been dating defendant in August 2008. Weather's adult daughter Danielle Waren and her infant lived with Weathers. Waren recalled a morning when she returned home around 9:00 a.m. and saw defendant's vehicle parked backwards in her mother's driveway with the driver's side door open. The garage door was open, the washing machine was running, and Waren smelled bleach. There was an empty bleach bottle on the kitchen table. Waren went to sleep in her room. She

6

heard the shower running in her mother's room.  When she woke up, Waren saw defendant in the house.  Later that afternoon, she saw the rug in her mother's bathroom had a bleach spot on it.  The following day, Waren heard about Saucedo's murder from a friend.  Detective Kirk Sullivan interviewed Waren on October 2, 2008, while police served a search warrant on her home.  Waren said the laundry incident occurred on August 14.  Weathers arrived home while police were still at the house.  She told Sullivan that defendant arrived at her house between 2:00 and 4:00 a.m. on the morning of the laundry incident.  He left around 4:00 a.m. and had a black revolver with him.  Weathers later asked defendant about the bleach.  Defendant told her he had used the bleach and that it had something to do with a lady and her having to be moved.  Sullivan spoke to Weathers again in 2013.  At that time, she again said defendant left her house that morning with a gun in his hand.  But Weathers was uncooperative at trial and denied everything.

**E.** ***Statements Made After the Murder***

    1. *Defendant's Statement to Alicia Hammond*

Alicia Hammond saw defendant sometime after Saucedo's murder; she introduced herself and tried to talk with him about Saucedo.  The next day, she went to defendant's house in Pittsburg and went with him and two women he was with to a bar in Antioch.  At some point, Hammond decided to sneak away.  She called a friend to pick her up from a gas station across the street.  While she was waiting, defendant drove up and opened his car door.  He had a gun sitting on his lap that was pointed in Hammond's direction.  He told her to get in.  She complied because she was afraid.  Defendant took her and the other two women to a diner.  Hammond went to the restroom and tried to borrow a cell phone to call for help, but she was stopped by one of the women with defendant.  Eventually, Hammond sat alone in the diner,

7

waiting for defendant and his friends to finish.  Defendant approached her and told her someone named "E-Rock"[4] would be "out to get" her.  Then he whispered in her ear, " 'Do you really want to know who killed your friend?  I did.' "

2.    *Defendant's Statements to Worsten Andrews*

Worsten Andrews was in custody at the Martinez jail at the time of trial.  He had known defendant since childhood but had not seen him in 15 years as Andrews had been incarcerated.  Before he went into custody, Andrews saw a video on someone's phone of defendant sodomizing a young man Andrews knew as "Beneficial."  "Beneficial" appeared unconscious in the video.  In 2014, Andrews saw defendant in the Martinez jail and told him he heard defendant had sodomized a boy.  Defendant said, "It didn't happen like that."

Andrews was released from custody and arrested again in November 2015 on his current case.  Andrews saw defendant in jail and again brought up the video.  Defendant claimed the video was altered.

Andrews testified that defendant told him that he and Bradshaw went to a house to "holler" at a "gay man" because the guy had a video on his computer of defendant having sex with him.  Defendant had a gun in his hand concealed by a towel wrapped around it.  There were two women inside the house.  Defendant argued and scuffled with the victim, and then shot him.  Afterward, he turned the gun on Bradshaw, but did not shoot him because Bradshaw begged for his life and said he had not seen anything.  Defendant told Andrews he should have killed Bradshaw because defendant knew he "couldn't hold his water."  Through his cell window, defendant

---

[4] Eric Beman, also known as "E-Rock," testified at trial; we discuss his testimony below.

showed Andrews a black and white photo of the victim lying down with a gunshot wound to his head. Andrews later told Detective Josh Reddoch that when defendant showed him the photo, he said, "This is my handiwork."

Andrews initiated a conversation with law enforcement in 2016 about defendant. Then, and at the time of trial, Andrews was facing a possible life sentence for charges of possession of a firearm, possession of a controlled substance, and human trafficking, with strike priors. The prosecution agreed that nothing Andrews said would be used against him but made no promises of leniency or reductions in his charges for the information. Andrews had numerous prior felony convictions including for making terrorist threats, attempted carjacking, and voluntary manslaughter.

3. *Defendant's Statements to Eric Beman*

Eric Beman, also known as E-Rock, was in custody at the time of defendant's trial. Beman testified that sometime after the murder of Saucedo, Maria Obregon told him she was in the house when a "gay dude" was murdered.

Defendant talked about the murder with Beman on two occasions. On one occasion, defendant said he had just gotten out of prison, having "beat a murder" with just a violation, which Beman understood to mean a parole violation. On another occasion, defendant told Beman that he had wrapped a towel around his gun to muffle the sound or to keep the powder from escaping. Defendant said the victim was not being submissive, so he threatened him and tried to scare him. He ordered the victim to his knees and pointed the gun at the victim's face, and the gun went off by accident.

Beman had numerous felony convictions. He had pleaded guilty to conspiracy to commit human trafficking and two counts of human trafficking, and was facing a maximum sentence of over 30 years in prison. He had an

9

agreement with the prosecution that if he testified in this case, it would be mentioned to the sentencing judge.

4.    *Bradshaw's Statements to Maria Obregon*

Maria Obregon was living with Bradshaw in Moser's house on Heights Avenue in August 2008, the month of the murder. She was not home when the murder occurred but learned of it the next day from Moser. She saw Bradshaw that day or the following day; Bradshaw was crying. Bradshaw told her that someone with a mask came in and shot Saucedo. The person also tried to shoot Bradshaw, but the gun jammed and the shooter fled. In 2013, Obregon told police that when she asked Bradshaw if he murdered Saucedo, Bradshaw said it was an accident and started to cry. He said that he and defendant were going to rob Saucedo and while they were robbing him the gun went off by accident.

Obregon's 2013 recorded interview with the police was played for the jury. She said Moser told her on the day of the murder that Saucedo had been shot in the room she shared with Bradshaw. Obregon believed Bradshaw when he said the shooting was an accident because Bradshaw had known Saucedo for a long time and they were related. As far as Obregon knew, Bradshaw did not have a gun, but she knew defendant did. Bradshaw said he and defendant planned to rob Saucedo of his "dope" or whatever he got for his "dope."

Obregon had convictions for receiving stolen property, car theft, possession of methamphetamine, assault on a peace officer, and evading a peace officer. Obregon was not offered any benefit for her statement.

5.    *Bradshaw's Statements to Lexington Crossman*

Lexington Crossman, a former Norteño gang member, grew up with Bradshaw and knew defendant from school. Crossman had several

10

convictions for stealing cars and committing drug offenses. He was removed from the gang around 2009 for fighting people in the gang.

Crossman testified that Bradshaw called him and asked him to relay a message to defendant to "[r]emain solid." So on March 21, 2013, Crossman sent defendant a text that said, "Look, our friend told me to ask you, he still remains solid, are you still solid? The one time came and saw him. Keep it 100, brown pride." Detective Reddoch testified that "one time came and saw him" meant the police had come and talked to him, that staying "100" meant staying true and not talking to the police. Crossman denied that Bradshaw had told him anything about Saucedo's murder.

The police went to see Crossman on April 30, 2013, a day after he was arrested for driving a stolen car and possession of drugs. No new charges were filed, but Crossman served time for a probation violation. He was also given witness relocation services and some financial assistance. At the time of the interview, Crossman was a regular methamphetamine user and had been for years.

A recording of Crossman's interview with police was played for the jury. During the interview, Crossman said that Bradshaw called him from prison a few months after the murder and told him that the plan had been to rob Saucedo. He said they thought Saucedo was an easy target, but instead he fought back and defendant "popped him." Bradshaw asked Crossman to tell defendant that the police had come by to talk to Bradshaw, that Bradshaw had remained solid, and that defendant needed to stay solid. Crossman was not getting along with defendant for unrelated reasons and did not want to do it, but he relayed the message to defendant by text. Crossman knew defendant had a gun because a few years earlier, he had thrown defendant's

11

gun out the window during a police chase, and he had to buy defendant a new .44 Magnum to replace it.

On cross-examination, Crossman admitted that he strongly disliked defendant and considered that he and Harper were enemies. Crossman did not know whether defendant was a Norteño.

### 6. *Bradshaw's Statements to Viridiana Grandov*

Viridiana Grandov was arrested for residential burglary in February 2010 with Bradshaw. In a 2013 police interview, Grandov reported that Bradshaw told her about a robbery in which a man ended up dead. At trial, Grandov said she made the 2013 statement because the police were pressuring her and she felt she needed to tell them what they wanted to hear in order to leave.

Detective Adam Deplitch testified that he interviewed Grandov on March 20, 2013. At her request, they met in a restaurant parking lot instead of at the police station. Grandov said Bradshaw told her that Saucedo was killed during a robbery that had gone bad. She said someone else was involved, but she did not know the person's name. Grandov told Deplitch she was afraid Bradshaw would retaliate against her for talking to the police.

## F. *Other Prosecution Evidence*

### 1. *Guns*

A few weeks before the murder, defendant showed Deanna Castro's stepfather, Geoffrey Dulik, two revolvers: one chrome, one black.

### 2. *Threat to Maria Obregon*

Maria Obregon testified that about a week before the murder, defendant put a gun to her head when she refused to answer his questions about another person.

### 3. *Incidents Involving Nicole Hair*

Nicole Hair testified that about a week before Saucedo's murder, she had been at a friend's house doing methamphetamine. Defendant and Bradshaw were also there. Hair called a friend to pick her up. Before the friend arrived, Bradshaw asked Hair if he and defendant could rob the guy. Hair said no.

Hair and her friend left to get something to eat. When they returned to the house they did not see defendant's car. Hair and her friend went into a bedroom to eat. Suddenly Bradshaw was standing in the doorway. Defendant came around the corner with a gun and wearing a wig of dreadlocks which covered his face. Defendant was pointing the gun at the ceiling. Hair ran into another bedroom.

When Hair looked out the door, she saw her friend on the floor with blood pouring out of his head. Defendant was standing over him with a gun in his hand. Bradshaw was nearby. Hair went back to the bedroom; when she emerged from the room Bradshaw and defendant were gone.

About a year after that incident, defendant drove up to Hair in his car, jumped out, and grabbed her by the hair. She saw a gun. She was able to run away. A few months after the hair grabbing incident, defendant saw Hair and told her she needed to go with him. She managed to get away and called 911. When police responded, Hair made a report.

### 4. *Rape of Benjamin Holloman ("Beneficial")*

Detective Reddoch testified that he located Benjamin Holloman, also known as "Beneficial," on the streets of Pittsburg. When Reddoch mentioned defendant's name, Holloman said, " 'Motherfucker raped me. Motherfucker drugged me.' " Holloman told Reddoch that as he was going in and out of

consciousness while being sodomized, he recognized defendant's voice saying, " 'You're my bitch.' "

## G. *Defendant's Offer to Plead Guilty*

Over defense objection, the prosecutor read a prior statement from defendant in which he had written: "Please take notice that in the above entitled court to be determined Derrick Harper respectfully asks that the Court hear his motion and allow all charges to stand against the accused. [¶] I am guilty of the murder of Jesse Saucedo. I the accused shot the man in the face and neck. [¶] I declare under penalty of perjury I did the murder and no one is making me say this. I am not crazy or have any suicidal thoughts. [¶] It is my right to plead and enter a guilty plea. [¶] Thank you."

## H. *Gang Evidence*

### 1. *Defendant's Kumi Gang Membership and Norteño Connection*

After being stopped by police on August 14, 2008, the day of Saucedo's murder, defendant told Detective Sullivan, "I don't talk to police. I'm a lieutenant in Kumi." Defendant had a text message on his phone from Bradshaw sent at 4:32 a.m. that morning that read, "Oh, what up loved one? Are you up? Get at me ASAP. Ain't mad at you. Got nothing but love for you." A text from defendant to Bradshaw sent at 6:22 a.m. read, "Let's go brother. Now bro."

In July 2012, Pittsburg Police Officer Raychel Whedbee witnessed defendant interfering with a police investigation at a gas station by defendant threatening another officer. When Officer Whedbee later spoke with defendant about the incident, he told her that after he left the gas station, he called "his boys because he [defendant] is a Kumi 415 lieutenant."

Casey Beck, a former Norteño gang member, knew defendant in 2008. At that time, defendant signed his texts with the letters XIV. Beck had

14

numerous felony convictions.  He came forward to law enforcement in March 2015 with information about defendant because he knew defendant was hurting people and he believed it was the right thing to do.  Beck was in jail at the time, but asked for no benefits.

    2.    *Expert Testimony*

Detective Charles Blazer, from the Pittsburg Police Department, testified as an expert in the Norteño gang.  The term "Norteño" covers members on the street, "Northern Structure" in prison and members of "Nuestra Familia."  There are thousands of Norteños in California.  Their symbols include "N" and its numerical representation as the 14th letter in the alphabet.  The number 14 can be shown in many different ways, including Roman Numerals (XIV).  The huelga bird tattoo is a symbol of dedication, indicating the person is a Norteño member who has put in work for the gang.

Norteños survive on "the three Rs": revenue, respect and revenge.  Revenue comes from drug sales, robberies, and burglaries.  They control territory through violence and fear; they control members and the public by making them afraid to go to the police.  The repercussions for snitching can include murder.

Blazer discussed the organizational structure of the Norteños and the way they operate on the streets and in the correctional system.  He described numerous incidents of Norteño activity that had occurred in the Martinez jail.  Blazer identified a "kite" written by a Norteño gang member in the Martinez jail describing an argument between him and another gang member in which Bradshaw interfered.  Based on these and other incidents, Blazer opined that Bradshaw was a Norteño.

15

Blazer opined that defendant was a Norteño gang member and a Kumi African Nation (Kumi) gang member at the time of Saucedo's murder. Blazer testified that the Norteños subsequently put defendant on a list of "no good" Norteños because he had committed same sex rape.

Sergeant Richard Cavagnolo, of the California Department of Corrections, testified as a Norteño and Kumi gang expert. Cavagnolo identified Kumi's symbols and primary criminal activities, which included drugs sales and robberies, and testified about its organizational structure. Kumi gang members had an alliance with the Norteños. Kumi gang members refer to one another as "loved ones". Homosexual activity is considered immoral and is against the Kumi bylaws.

Cavagnolo discussed incidents in which Bradshaw acted as a Norteño gang member within the correctional system. He also testified about defendant's relationship with the Kumi gang. In 2001, while attempting to drop out of the Kumi gang in prison, defendant told a correctional officer he became a member of Kumi in 1998, had risen to the position of lieutenant, and had an allegiance with the Norteños. Later, in 2007, defendant denied dropping out of Kumi and asked, "How could I be a dropout if they say I am a lieutenant?"

The prosecution played seven recordings downloaded from defendant's cell phone. The recordings, made around December 2012, were conversations between defendant and others discussing topics such as guns, guarding gang turf, and assaulting a Norteño known as "Hitman" for spreading the word that defendant was a snitch. Defendant's cell phone also contained a video of Hitman being assaulted.

In Cavagnolo's opinion, Bradshaw was a functioning Norteño at the time of Saucedo's murder, and defendant was a functioning Kumi who

16

associated with Norteños. In responding to a hypothetical that described the facts of the case, Cavagnolo opined in essence that the robbery and murder of Saucedo was committed for the benefit of the Norteños and Kumi. Cavagnolo testified that when gang members commit crimes like robbery and homicide, it elevates the gang's status. If a victim resisted and a gang member did not respond violently, it would cost the gang member respect and affect his career with the gang. The loss of respect would be even worse if the victim were gay because homosexuality is frowned upon by Norteños and Kumi.

## I.    *Defense Case*

Defendant played the recording of his August 14, 2008 interview with Detectives Sullivan and Reposa. When Sullivan referred to defendant bragging about being a lieutenant in Kumi, defendant replied, "Man, past tense." Asked what Bradshaw was going to say when the police talked to him, defendant replied, "I don't know what [Bradshaw's] gonna tell you. I know what I seen when I got up here—." Defendant acknowledged that "somebody does know something," but said "That somebody ain't me. You're talking to the wrong person."

Defendant played an excerpt from Castro's August 14, 2008 interview with the police. When asked where defendant was, Castro said, "I think at that time he was running in the house. . . . [¶] Just kind of asking what happened. Yeah, asking what happened or something. I'm not quite sure, I don't really know." Asked where she first saw defendant, Castro said, "In the house, he was like right there in the front room." Asked who had the gun, Castro replied, "I don't know, I didn't see no gun." The officer told her, "One of them had to be standing there with a gun." Castro replied, "I didn't see one, I swear I did not see no gun. I didn't. 'Cause I'm telling you I did not. I heard it but I couldn't see it."

17

Defendant presented a transcript of the February 25, 2014 hearing at which he wrote the note that was introduced in the prosecution's case-in-chief stating he murdered Saucedo and wanted to plead guilty.

Defendant recalled Beman as a witness and asked him about why he was afraid to testify against him. Beman told Detective Deplitch that it would be a death sentence to testify against defendant.

Beman testified that he told Detective Deplitch that the shooting happened outside on Marin Street. He told Deplitch that defendant told him he shot Saucedo in the face, and that defendant had a towel wrapped around the gun.

## DISCUSSION

### A. *Single Trial Before Two Separate Juries*

Defendant contends he was denied a fair trial by the trial court's decision to proceed with a single trial before two juries.

#### 1. *Background*

Before trial both defendant and Bradshaw moved to sever the defendants' cases for trial. The trial court granted severance due to a statement defendant made to police in 2008 that referenced Bradshaw. But over defendant's objection, the court granted the prosecutor's request to proceed with a single trial before two juries. The trial court concluded that the "vast majority of the evidence in this trial will be . . . admissible against both defendants," and thus it would be "much more efficient than two entirely separate trials where every witness has to testify at least twice." The court noted that possible antagonistic defenses were not an impediment to having two juries, and in any event, found that "this is not a case where the defenses

18

are such that the [acquittal] of one party would—mandate[ ] the conviction of the other and vice versa."[5]

### 2. *Applicable Law*

Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." Thus, there is a strong legislative preference for joint trials, stemming both from the fact that they " 'promote economy and efficiency' " and " ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman*), citing *Zafiro v. United States* (1993) 506 U.S. 534, 537, 539 (*Zafiro*).) Here, because defendants were charged with committing common crimes involving common events and the same victim, this is a " ' "classic case" ' " for a joint trial. (*People v. Souza* (2012) 54 Cal.4th 90, 109, 110 (*Souza*); *Coffman, supra,* at p. 41.)

---

[5] The trial court's reasoning is worth stating: "Mr. Harper claimed in his statement to the police that he arrived at the residence after the homicide occurred. [¶] If the jury credits that defense theory, then that does not require the conviction of Mr. Bradshaw. [¶] On the other hand, Mr. Bradshaw claimed to the police that a masked man broke into the apartment and shot Mr. Saucedo and threatened Mr. Bradshaw. [¶] If that is accepted by the jury, they would acquit Mr. Bradshaw. It does not mandate that they convict Mr. Harper. [¶] So they are not defenses or—that are inconsistent in the sense that they cannot possibly both be considered. In other words, Mr. Bradshaw could have been robbed by a masked man who shot Mr. Saucedo, ran out the door, and Mr. Harper arrived after the murder as he claimed. None of those are necessarily inconsistent. [¶] I do understand that there may be aspects that are antagonistic. Again, the case law, [*People v.*] *Jackson* [(1996) 13 Cal.4th 1164] and [*People v.*] *Cummings* [(1993) 4 Cal.4th 1233 (*Cummings*)] expressly holds that that's not a basis for mandating separate jury trials."

19

It is well settled that defendants are not entitled to severance "merely because they may have a better chance of acquittal in separate trials." (*Zafiro, supra,* 506 U.S. at p. 540.) To the contrary, under section 1098, "a trial court *must* order a joint trial as the 'rule' and *may* order separate trials only as an 'exception.' [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 190.) " 'The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses.' [Citations.] 'Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." ' " (*Souza, supra,* 54 Cal.4th at p. 109.) "The use of dual juries is a permissible means to avoid the necessity of complete severance. The procedure facilitates the Legislature's statutorily established preference for joint trials of defendants and offers an alternative to severance when evidence to be offered is not admissible against all defendants. [Citations.]" (*Cummings, supra,* 4 Cal.4th at p. 1287.)

We review the denial of a motion for severance for abuse of discretion, based on the facts at the time of the ruling on the motion. (*Coffman, supra,* 34 Cal.4th at p. 41.) "That defendants have inconsistent defenses and may attempt to shift responsibility to each other does not compel severance of their trials [citation], let alone establish abuse of discretion in impaneling separate juries." (*Cummings, supra,* 4 Cal.4th at p. 1287.) Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial. (*Coffman,* at p. 41; *People v. Massie* (1967) 66 Cal.2d 899, 922-924 [applying standard of *People v*

*Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].) If the trial court's joinder and impanelment of dual juries was proper when made, we will reverse only on a showing of " 'gross unfairness' " amounting to a denial of due process. (*Cummings, supra,* 4 Cal.4th at p. 1287; *Souza, supra,* 54 Cal.4th at p. 109.)

    3.    *Analysis*

Defendant contends that even if the trial court did not abuse its discretion in ruling on his severance motion at the time it was made, the denial of severance resulted in gross unfairness sufficient to constitute a denial of due process because of what happened during the trial. (*People v. Powell* (2018) 6 Cal.5th 136, 145-146.) Defendant places the blame squarely on the alleged misconduct of Bradshaw's counsel, who he contends sought to introduce prejudicial evidence of defendant's bad character before defendant's jury. According to defendant, Bradshaw's counsel's defense strategy was to portray defendant as a violent individual in order to exculpate Bradshaw.

Defendant lists five instances in which Bradshaw's counsel asked witnesses questions calling for inadmissible and prejudicial character evidence. However, in three of those instances, defendant's counsel objected, and the trial court sustained the objection *before* the witness answered.[6] Plus, the trial court specifically admonished the jury to disregard the

---

[6] In one instance, Bradshaw's counsel asked Nicole Hair if she told a defense investigator that she believed Bradshaw did not know what was going to happen at his house on the morning Saucedo was killed. In the next instance, Bradshaw's counsel asked Alicia Hammond about an occasion where she confronted defendant about pulling a gun on her. The third instance occurred when Bradshaw's counsel asked Detective Deplitch if the fear of retaliation for speaking with police could extend to a codefendant who is in custody. The trial court also denied defendant's subsequent requests for a mistrial with respect to Hair and Hammond on the grounds that questions were asked, objections were made, and no answers were given.

21

questions when an objection was sustained. (See CALCRIM No. 222.[7]) We presume the jury understood and followed this instruction. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.)

In addition to the questions that yielded no answers, defendant complains that Castro, under questioning by Bradshaw's counsel, testified that she heard Bradshaw say at the scene, " 'Don't shoot me. Don't shoot me. I promise I won't tell.' " Further, when questioned by the prosecutor, Castro testified that Bradshaw looked frightened when she saw him in the car with defendant as they fled the house after the murder. In both of these instances, the trial court ruled the testimony was admissible. That this evidence tended to shift responsibility from Bradshaw to defendant did not compel severance of their trials or constitute an abuse of discretion on the part of the trial court. Here, as in *Cummings,* "the defense positions were antagonistic because the identity of the killer was disputed by defendants. That each was involved in the incident was undisputed[.]" (*Cummings, supra,* 4 Cal.4th at p. 1287.) Moreover, as in *Cummings*, "this was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was that person." (*Ibid.*) Rather, the prosecution's theory was that both defendants participated in, and were guilty of, the murder.

---

[7] CALCRIM No. 222, as given, provided in part as follows: "Nothing that the attorneys say is evidence. . . . Their questions are not evidence. . . . Do not assume that something is true just because one of the attorneys asked a question that suggested it was true. [¶] . . . If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did."

Although defendant's jury did hear testimony that arguably implicated him, there was no "gross unfairness."[8]  By impaneling separate juries for defendant and Bradshaw, any impact the defendants' respective trial strategies might have on the other was minimized.  (*Cummings, supra,* 4 Cal.4th at p. 1288.)  The jury was also aware defendant and Bradshaw were attempting to avoid responsibility by shifting blame to the other defendant.  (*Ibid.*)

Even if the actions of Bradshaw's counsel could be characterized as misconduct (a conclusion we need not reach), we reject the notion that the joint trial with separate juries was unfair as a result.[9]  As our Supreme Court explained in *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 385, "[t]he presentation of disputed testimony occurs in almost every trial and accusations of improper conduct are common.  'Juries are not so susceptible that they cannot measure intelligently the weight of [evidence] that has some questionable feature.'  (*Manson v. Brathwaite* (1977) 432 U.S. 98, 116.)"  The same is true here.  Nothing in the record indicates defendant's jury was unable to intelligently weigh the evidence.  Simply because Bradshaw's jury

---

[8] Defendant argues that "another instance of extreme prejudice" occurred during Bradshaw's case when the prosecutor elicited testimony that defendant had interfered with Officer Ruff's investigation on two occasions. But the prosecutor elicited this information only after defendant, who was then representing himself, suggested by his cross-examination that Officer Ruff had pat-searched him in an inappropriate manner.  Thus the challenged testimony was the direct result of defendant's own trial strategy; it also would have been admissible in a separate trial.  We similarly are unpersuaded by defendant singling out questions posed only in front of Bradshaw's jury; defendant could not have been prejudiced by testimony his jury did not hear.

[9] We similarly reject the claim that the trial court's refusal to grant a mistrial on these grounds resulted in unfairness.

was unable to reach a verdict and a mistrial was declared, does not render defendant's guilty verdict unfair.

In short, the trial court did not abuse its discretion by refusing to sever defendant's and Bradshaw's trial, and defendant was not subjected to gross unfairness so as to constitute a due process violation (*Cummings, supra,* 4 Cal.4th at p. 1287).

But even assuming the court should have granted defendant's severance motion, we would not find prejudice under the *Watson* standard. (*Coffman, supra,* 34 Cal.4th at p. 41.) Defendant complains that the joint trial enabled Bradshaw to paint him as a "dangerous and frightening man." However, even had there been separate trials, there was ample evidence from which the jury could have assessed defendant's violent tendencies. This evidence included two witnesses who saw defendant with a gun in the weeks before the murder; Maria Obregon's testimony that defendant put a gun to her head when she was not forthcoming with information he wanted; Alicia Hammond's testimony that defendant followed her in his car and told her to get in and her compliance only because she was afraid of him and could see a gun on his lap that was pointed in her direction; and Nicole Hair's testimony that defendant threatened her to not talk to police about his involvement in the robbery of her friend. There was also evidence that defendant had sodomized an unconscious person. Moreover, the evidence of defendant's guilt was strong: Deana Castro testified she heard a gunshot and saw the victim Saucedo on the ground and defendant with a gun in his waistband. Defendant told three people that he had killed Saucedo. All of this, without even taking into account the document from defendant admitting that he was guilty of killing Saucedo, which we discuss below.

24

Accordingly, we conclude there is no reasonable probability defendant would have received a more favorable result in a separate trial. (*Coffman, supra,* 34 Cal.4th at p. 41; *Watson, supra,* 46 Cal.2d at p. 836.)

**B.** ***Assembly Bill 333 and the Gang Enhancement***

In August 2017, the jury found true the allegation that defendant committed first degree murder in association with or for the benefit of a criminal street gang.[10] (§ 186.22, subd. (b).)

As we have noted, Assembly Bill 333 became effective on January 1, 2022, after we rendered our prior opinion affirming defendant's murder conviction and related gang and firearm enhancements. The legislation amends section 186.22, subdivision (b) to impose new elements to prove a gang enhancement. It also adds section 1109 to the Penal Code, which provides for bifurcation at trial, upon defendant's request, of gang enhancement allegations from the underlying offenses.

Defendant contends Assembly Bill 333 requires reversal of the true finding on the criminal street gang enhancement. He further argues his murder conviction must be reversed in light of the new bifurcation requirement of section 1109. We first address the amendments to section 186.22 and then turn to new section 1109.

1. *Amendments to Section 186.22*

Section 186.22 provides for enhanced punishment when the defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific

---

[10] The information alleged two gang enhancements (§ 186.22, subds. (b)(1)(C) & (b)(4)). The verdict did not differentiate between the two and just referred to "gang allegation." At the sentencing hearing, the trial court determined subdivision (b)(4) applied. The sentencing minute conforms to the court's oral pronouncement.

intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Assembly Bill 333 amended section 186.22 in several fundamental ways. As relevant here, Assembly Bill 333 "redefines 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' [Citation.]" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*). In addition, the currently charged offense cannot be used as a predicate offense under the amendments made by Assembly Bill 333. (*Ibid.*)

Subdivision (g) of section 186.22 now defines the term "to benefit, promote, further, or assist" a criminal street gang to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational," which may include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." Previously, proof of a reputational benefit to the gang would suffice. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819.)

a.      Retroactivity

Amended section 186.22 does not specify whether the changes to the statute apply retroactively to non-final cases still pending on appeal. As we explain, we agree with the parties that they do.

In *In re Estrada* (1965) 63 Cal.2d 740, 744–746 (*Estrada*), our Supreme Court held that, absent evidence to the contrary, the Legislature intended

26

amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307–308; *People v. Brown* (2012) 54 Cal.4th 314, 323.) This principle also applies when an enhancement has been amended to redefine to a defendant's benefit the conduct subject to the enhancement. (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 68, 70–71 (*Figueroa*).)

Recently, the Court of Appeal in *Lopez, supra*, 73 Cal.App.4th 327, applying *Estrada*, held the amendments Assembly Bill 333 made to section 186.22 are retroactive to non-final judgments. (*Id.* at pp. 343-344.) *Lopez* reasoned Assembly Bill 333 increased the "threshold for conviction of the section 186.22 offense and the imposition of the enhancement[.]" (*Id.* at p. 344.) Accordingly, *Lopez* concluded " 'a defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending case.' " (*Ibid.*, quoting *Figueroa, supra,* 20 Cal.App.4th at p. 68.) Several recent appellate decisions have applied this reasoning and have also concluded the amendments to section 186.22 are retroactive. (*People v. Perez* (2022) __ Cal.App.5th __ [2022 WL1302282, *16]; *People v. Burgos* (2022) __ Cal.App.5th __ [2022 WL 1124863, *7] (*Burgos*); *People v. Ramos* (2022) __Cal.App.5th __ [2022 WL 1233755, *9-10]; *People v. Rodriguez* (2022) 75 Cal.App.5th 816 [2022 WL 602294, *7]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478; *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087, review filed Mar. 22, 2022; *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032 & fn. 9; *People v. Sek* (2022) 74 Cal.App.5th 657, 666-667.) We, too, agree and hold

27

Assembly Bill 333's amendments to section 186.22 apply retroactively to defendants whose convictions are not yet final.

### b. Necessity for Remand

The Attorney General concedes the gang evidence at defendant's trial, presented under the old law, fell short of meeting the new requirements of proof required by amended section 186.22. Specifically, there was no evidence presented that the current offense provided a common benefit to members of a gang that was more than reputational. The Attorney General also agrees with defendant that the jury was not instructed on the new elements now required to prove the gang enhancement. Further, the jury was instructed under the former law that it could use the current offense as a predicate offense, which is no longer permitted under the amendments to section 186.22.

The parties agree that reversal of the gang enhancement is required unless this court can determine that the errors pertaining to section 186.22 were harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). The Attorney General readily and properly concedes the errors are not harmless. Because it is not clear beyond a reasonable doubt that a rational jury would have found the gang enhancement true had it been instructed under the law as amended by Assembly Bill 333, the gang enhancement must be vacated. We will remand to the trial court to permit the People to elect to retry the enhancement or, if the People do not elect to do so, for the court to proceed with resentencing defendant in conformance with this opinion.

### 2. *Any Error in Trying the Gang Enhancement Allegation with the Substantive Offense Was Harmless*

Prior to trial, defendant joined in Bradshaw's motion to bifurcate their respective gang enhancements from the underlying charges. The trial court

denied the motion, stating the robbery and murder were "inextricably intertwined with gang evidence," the gang evidence would have been admissible on the issues of motive and intent in the murder trial alone, and the murder evidence was more prejudicial than the gang evidence.

In his original brief in this appeal, defendant contended that the trial court's denial of his motion to bifurcate the gang enhancements constituted prejudicial error and denied him due process. In his supplemental briefing, he raises an additional argument in light of newly enacted section 1109: his murder conviction should be reversed in light of the change in the law that requires bifurcation upon a defendant's request. The Attorney General contends defendant is not entitled to a reversal of his murder conviction because section 1109 is not retroactive and is thus inapplicable to defendant's case.

a.    Bifurcation and Section 1109

Prior to the enactment of section 1109, trial courts had broad discretion under section 1044[11] to deny bifurcation of the underlying charge from the finding on truth of the gang allegations. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) Newly enacted section 1109 has changed that. Now, upon a request by the defense, "a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation

---

[11] Section 1044 provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a)(1)-(2).) Section 1109 is silent as to whether it applies retroactively or only prospectively.

> b.   Application

Defendant argues section 1109 should be retroactive under the principles of *Estrada.* The Attorney General counters that section 1109 operates prospectively. Citing to *People v. Cervantes* (2020) 55 Cal.App.5th 927 (*Cervantes*), and *People v. Sandee* (2017) 15 Cal.App.5th 294 (*Sandee*), the Attorney General asserts that *Estrada* is inapplicable to section 1109, because the statute is procedural and does not convey a substantive benefit.

In *Cervantes*, the court rejected the defendant's argument that amendments to section 859.5, which was silent on the issue, were retroactive. (*Cervantes*, *supra*, 55 Cal.App.5th at p. 940.) The *Cervantes* court emphasized, "Ultimately, the applicability of the *Estrada* rule to a particular legislative change depends on whether the statute at issue is " 'analogous" to the *Estrada* situation' and whether the logic of *Estrada* applies. [Citation.]" (*Cervantes*, at p. 940.) "The 2017 amendments to section 859.5 are not analogous to the statute at issue in *Estrada.* To the contrary, their effect is to impose requirements on certain interrogations, and to circumscribe the admissibility of those statements if those requirements are not met or excused. . . . The amendments do not . . . alter the substantive requirements for conviction, nor affect the available punishments in the event of conviction. They do not alter or reduce criminal punishment or treatment." (*Ibid.*, fn. omitted.)

In *Sandee*, the court rejected the defendant's argument that a law enforcement search of her cell phone violated the Electronic Communications

Privacy Act  (§ 1546 et seq.) (ECPA), which became effective after the challenged search was conducted.  (*Sandee, supra,* 15 Cal.App.5th at p. 304.) The court held that *Estrada* did not apply, because ECPA did not lessen the punishment for a crime, decriminalize conduct, or expand criminal defenses. (*Id.* at p. 305, fn. 7.)

Relying primarily on *People v. Frahs* (2020) 9 Cal.5th 618, which held the mental health diversion statute (§ 1001.35) applied retroactively to all cases not final on its effective date because it "provides a possible ameliorating benefit for a class of persons—namely, certain defendants with mental disorders—by offering an opportunity for diversion and ultimately the dismissal of charges" (*id.* at p. 625), defendant argues the ameliorative benefits of bifurcating the trial of gang enhancement allegations have a "similar . . . effect," and the same inference of retroactivity should apply as in *Frahs*.

Recently, in *Burgos, supra,* 2022 WL 1124863 a divided appellate court held section 1109 applies retroactively.  Over a vigorous dissent, the majority, relying on various legislative findings [12] concluded that "one of the

___

[12] The legislative findings in Assembly Bill 333 cited by the majority in *Burgos* are as follows:  (1) "The gang enhancement statute is applied inconsistently against people of color, creating a racial disparity."  (Stats. 2021, ch. 699, § 2, subd. (d)(1).); (2) "Current gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people based on their cultural identity, who they know, and where they live."  (*Id.*, § 2, subd. (a).); (3) "Being designated as a gang member or associate negatively impacts a person's criminal legal system contact from start to finish by hindering pretrial release, influencing sentencing, incarceration, parole, and reentry, and can lead to deportation."  (*Id.*, § 2, subd. (b).); (4) "The current statute disproportionately impacts communities of color, making the statute one of the largest disparate racial impact statutes that imposes criminal punishments."  (*Id.*, § 2, subd. (d)(2).); (5) "Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact."  (*Id.*,

31

Legislature's foremost reasons for enacting Assembly Bill 333 was to ameliorate the disparate levels of punishment suffered by people of color." (*Id*. at *9.) "The findings further establish that the bifurcation of gang enhancements at trial is intended to ameliorate the prejudicial impact of trying enhancements together with the offense." (*Id*. at *10.) Thus, according to the majority, "one of the ameliorative effects of bifurcation is that some defendants will actually be *acquitted* of the underlying offense absent the prejudicial impact of gang evidence. This increased possibility of acquittal—which necessarily reduces possible punishment—is sufficient to trigger retroactivity under the *Estrada* rule." (*Ibid.*) The court summarily rejected the argument that different parts of Assembly Bill 333 "should be treated differently under *Estrada*" and concluded section 1109 should also be applied retroactively. (*Ibid.*)

The *Burgos* majority also opined that the failure to bifurcate "likely constitutes 'structural error' because it def[ies] analysis by harmless-error standards." (*Burgos, supra,* 2022 WL 1124863 at *11.) But even if it was amenable to harmless error, the court explained "it is not clear whether we should apply the federal or the state law standard." (*Ibid.*) In any event, the court concluded the defendants in *Burgos* were prejudiced under either

§ 2, subd. (f).); (6) "Gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (*Id.*, § 2, subd. (d)(1).); (7) "California courts have long recognized how prejudicial gang evidence is. [Citation.] Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.]" (*Id.*, § 2, subd. (e).); (8) "The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (*Id.*, § 2, subd. (e).)

standard because the evidence of the underlying crime "was not overwhelming." (*Ibid.*)

The *Burgos* dissent determined "section 1109 is not an *ameliorative* statute within the meaning of the *Estrada* rule, and therefore it is subject to the *general rule* that Penal Code provisions are presumed to be prospective only." (*Burgos, supra,* 2022 WL 1124863 *12 (dis. opn. of Elia, J.).) "The majority opinion's mere speculation that a defendant might be acquitted if the gang allegations are bifurcated does not bring section 1109's bifurcation provisions within the *Estrada* rule." (*Id.* at *14 (dis. opn. of Elia, J.).) Moreover, the majority gave "short shrift to the fact that the *Estrada* rule is an exception to the general rule. 'No part of [the Penal Code] is retroactive, unless expressly so declared.' (§ 3.) Thus, the default presumption, unless the *Estrada* rule applies, is that a new law is *not retroactive.* The *Estrada* rule applies *only* where the new law is "ameliorative" of criminal liability or punishment. The general rule of prospectivity applies here because nothing in section 1109 is ameliorative of criminal liability or punishment. Indeed, the Legislature's express findings and the legislative history affirmatively demonstrate that section 1109 was intended to have a prophylactic effect at future criminal proceedings by mandating new procedures that were designed to reduce the risk of prejudice. The majority opinion cites no authority for applying the *Estrada* rule to a new law of this type. Hence, the general rule applies, and section 1109 is presumptively *not* retroactive." (*Id.* at *14 (dis. opn. of Elia, J.).)

The dissent further disagreed that the legislative findings " 'show the Legislature intended to reduce punishment specifically for people of color' " or that " '[b]y reducing the pressure to accept longer sentences, the new bifurcation statute will necessarily reduce the degree of punishment for' "

33

defendants charged with gang enhancements. (*Burgos, supra,* 2022 WL 1124863 at * 14 (dis. opn. of Elia, J.).) Moreover, while agreeing that the amendments to section 186.22 are ameliorative, since they narrow the scope of criminal liability, the dissent contended that the retroactivity of each amendatory statute in a single legislative bill should be separately analyzed. (*Id.* at *15 (dis. opn. of Elia, J.).) As it noted, "Many legislative bills amend numerous (sometimes hundreds of) statutes, and whether a specific amendatory statute is subject to the *Estrada* rule depends on the nature of the amendment, not the mere fact that the amendment was enacted in the company of other amendments in a single legislative bill." (*Ibid.*)

We need not decide whether section 1109 should be applied retroactively, because we conclude the failure to bifurcate the gang evidence does not constitute reversible error in this case.[13] The California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Recently, our Supreme Court in *In re Christopher L.* (2022) ___ Cal.5th ___ [2022 WL 1210274] provided a concise

---

[13] Other recent decisions have reached different conclusions. In *People v. Perez, supra,* 2022 WL 1302282, the court, while acknowledging section 1109 is "designed to minimize the prejudicial impact of gang evidence," held it does not apply retroactively because "it does not reduce the punishment or narrow the scope of the application of the gang statute." (*Id.* at *17.) In *People v. Ramos, supra,* 2022 WL 1233755, the court recently held section 1109 should apply retroactively but concluded the defendant was not entitled to reversal of his underlying conviction because he could not establish prejudicial error under the *Watson* standard. (*Id.* at *11-13.)

review of the concepts of harmless and structural error: " 'When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. ([*Watson, supra,*] 46 Cal.2d [at p.] 835.)' (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Federal constitutional errors require reversal unless the beneficiary of the error can show it was 'harmless beyond a reasonable doubt.' (*Chapman, supra,* 386 U.S. at p. 24.)

"But not all errors are amenable to harmless error analysis. We have, 'in a number of contexts, [found] that certain errors, by their nature, result in a "miscarriage of justice" within the meaning of the California harmless-error provision requiring reversal without regard to the strength of the evidence received at trial.' (*People v. Cahill* (1993) 5 Cal.4th 478, 493 . . . .) For example, per se reversal is required when a court refuses or fails to allow a party to present its entire case before the trier of fact (*Fewel v. Fewel* (1943) 23 Cal.2d 431, 433), when there is improper discrimination in jury selection (*People v. Wheeler* (1978) 22 Cal.3d 258, 283), or when a codefendant is denied the right to separate counsel (*People v. Douglas* (1964) 61 Cal.2d 430, 437–439)." (*In re Christopher L., supra,* 2022 WL 1210274 at *3–4].)

Errors are considered "structural" when they represent "defect[s] affecting the framework within which the trial proceeds" and, thus are reversible per se. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310; see *People v. Stewart* (2004) 33 Cal.4th 425, 462.) Structural error " 'def[ies] analysis by "harmless error" standards' " because the error has " 'consequences that are necessarily unquantifiable and indeterminate.' " (*United States v. Gonzales–Lopez* (2006) 548 U.S. 140, 148, 150.) "Trial errors, by contrast, are errors that 'occurred during the presentation of the

case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented' in order to determine whether the error was harmless. (*Arizona v. Fulminante, supra,* 499 U.S. at pp. 307-308.) There is a strong presumption any error falls within the latter category, and it is the rare case in which a constitutional violation will not be subject to harmless error analysis. (*Sullivan v. Louisiana* [(1993)] 508 U.S. [275,] 282 (conc. opn. of Rehnquist, C. J.).)" (*People v. Marshall* (1996) 13 Cal.4th 799, 851.)

Applying these established principles, we disagree with the *Burgos* majority that failure to bifurcate gang evidence from the underlying offense "likely" constitutes structural error. (*Burgos, supra,* 2022 WL 1124863 at *11.) The admission of prejudicial gang evidence is trial error, the effect of which may be quantitatively assessed, rather than an error affecting the framework of the trial. For example, in *People v. E.H., supra,* 75 Cal.App.5th 467, the court applied the *Watson* harmless error analysis in light of the enactment of section 1109 and concluded, without reaching the issue, that even if section 1109 were retroactive, it was not " 'reasonably probable' " the defendant "would have obtained a more favorable result if his trial had been bifurcated." (*Id.* at p. 480; see also *People v. Ramos, supra,* 2022 WL 1233755 at *13 [failure to bifurcate was harmless error under *Watson*].) We also note that in *People v. Albarran* (2007) 149 Cal.App.4th 214, 229-232 (*Albarran*), albeit not in the bifurcation context, the court held admission of inflammatory gang evidence was subject to *Chapman* harmless error analysis because the evidence deprived defendant of a fair trial.

We need not determine which harmless error standard applies, because under either standard defendant has not demonstrated prejudicial error. Unlike the evidence in *Burgos,* which the court found was not

36

"overwhelming,"[14] here the People presented strong evidence that defendant committed the murder. That evidence included percipient witness testimony from Castro, who heard a gunshot at the scene and then immediately saw the victim on the ground and defendant with a gun in his waistband. In the weeks before the murder, Dulik (Castro's stepfather) saw defendant with two guns. On the morning of the murder, defendant left Weathers's house around 4:00 a.m. with a gun. Shortly thereafter, at about 4:32 a.m., codefendant Bradshaw texted defendant and said to contact him "ASAP." Defendant replied, just before the murder, with "Let's go brother. Now bro." Following the murder, defendant was seen washing his clothes in bleach. Defendant admitted to no fewer than three people (Hammond, Andrews, and Beman) that he had killed Saucedo. Defendant also showed Andrews a photo of the victim, lying down with a gunshot wound to the head and bragged, "This is my handiwork." And in addition to all of this evidence, the prosecution

---

[14] As the majority succinctly described the evidence in *Burgos*, "[N]either [robbery] victim identified any of the [three] appellants at trial, and the evidence of their in-field identifications was somewhat muddled. The victims described four to six men involved. One of the charged men (Lozano) pleaded guilty before trial without identifying anyone else, and another one of the defendants (Byrd) was acquitted. While the 7-Eleven videos put appellants near the scene of the robbery, the evidence did not show them committing the crime. Similarly the fact that stolen evidence was found in Byrd's apartment did not establish which of the persons inside the apartment actually stole it. And Richardson [an appellant] presented plausible evidence that he had been mistaken for . . . another one of the persons found inside the apartment. Given this evidence, it is likely the jury relied on evidence of appellants' gang membership in considering the identity issues. Finally, there was no clear evidence that Stevenson [another appellant] actually did anything during the robbery apart from being present. . . . [T]he jury likely relied on his gang affiliation to infer he aided and abetted the robbery." *(Burgos, supra,* 2022 WL 1124863 at \*11.)

submitted a document from defendant stating that he was guilty of killing Saucedo.

### c.     No Due Process Violation

Finally, we reject defendant's original claim that the denial of bifurcation resulted in an unfair trial that deprived him of due process. Defendant relies on *Albarran, supra,* 149 Cal.App.4th 214, where a divided appellate court found the admission of gang evidence inflammatory and prejudicial because the trial court had earlier dismissed the gang allegations following a new trial motion, and the prosecution failed to present evidence the underlying crimes were gang motivated. (*Id.* at pp. 227–228.) The *Albarran* court held that, even if some gang evidence had been relevant to motive and intent, other irrelevant and inflammatory gang evidence had been admitted. (*Ibid.*) The jury heard lengthy testimony about other gang members, the wide variety of crimes they had committed, and the numerous contacts between police and gang members. The prosecution's gang expert described a specific threat the gang had made to kill police officers. (*Ibid.*) The *Albarran* majority concluded a real danger existed that the jury, regardless of actual guilt, would want to punish the defendant based on his past crimes and because he posed a threat to police and society at large. (*Id.* at p. 230.) The *Albarran* majority concluded the case was "one of those rare and unusual occasions" where the admission of evidence amounted to a violation of federal due process and rendered the trial fundamentally unfair. (*Id.* at p. 232.) Given the nature and amount of the gang evidence, including the number of witnesses who testified about it, and the role the gang evidence played in the prosecutor's argument, the divided appellate court held the trial court erred in failing to order a new trial on all of the charges. (*Ibid.*)

38

*Albarran* is distinguishable. The failure to bifurcate the gang evidence in this matter did not result in a denial of due process. Unlike in *Albarran*, the evidence here connected defendant to the charged crimes and overwhelmingly established his guilt. Further, although much of the evidence regarding gang hierarchy and activities in jails and prisons was irrelevant to the charged offense in defendant's case, the risk of prejudice was low. While defendant maintains that the gang evidence painted him as violent and vengeful, none of the gang evidence was as inflammatory as the murder itself—a gunshot to the head—such that it might lead a jury to convict defendant without regard to his guilt. And, in the context of this multi-week trial involving two defendants and two different gangs, two days of gang expert testimony was proportional.[15]

Even without the gang evidence, as we have discussed, there was abundant evidence that defendant was violent and dangerous. As we have described, this evidence included two witnesses who saw defendant with a gun in the weeks before the murder; Maria Obregon's testimony that defendant put a gun to her head when she was not forthcoming with information he wanted; Alicia Hammond's testimony that defendant followed her in his car and told her to get in and her compliance only because she was afraid of him and could see a gun on his lap that was pointed in her direction; and Nicole Hair's testimony that defendant threatened her to not talk to police about his involvement in the robbery of her friend.

Accordingly, it is clear under any standard that defendant would not have obtained a more favorable result had the gang evidence been excluded

---

[15] The evidentiary portion of the trial took place over 18 days. The prosecution's case-in-chief and rebuttal consumed 15 days.

from the murder trial. (*Chapman, supra,* 386 U.S. 18 at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.)

## C. *Admission of Defendant's Alleged Offer to Plead Guilty*

Defendant contends the trial court erred in allowing the prosecution to introduce an alleged offer to plead guilty in this case. Defendant contends the evidence was inadmissible under Evidence Code section 1153 and section 1192.4, which preclude admission of guilty pleas that have either been withdrawn or not accepted by the prosecuting attorney and approved by the court.

### 1. *Background*

#### a. The February 25, 2014 Hearing

On February 25, 2014, defendant, then-represented by deputy public defender Patrick Cannon, appeared at a hearing in this case before Judge Terri Mockler. The transcript of the proceedings reflects that the court was attempting to appoint a new attorney because defendant was angry and frustrated about the handling of his case by deputy public defender Jane Ryan. When the court began to express its view about the best course of action to protect defendant's due process rights, the following colloquy occurred:

"DEFENDANT: Shit, there ain't no due process protected. Let's pretend I'm not sitting here. I'm visible.

"THE COURT: —is to remove Mr. Cannon and have a completely brand new counsel appointed to represent Mr. Harper.

"THE DEFENDANT: What, so they can do what Jaye Ryan did? Basically try to railroad me, falsify— [¶] . . .

"THE DEFENDANT: You violated my rights, man. You allowed this crazy shit to go on. I wrote you a letter about this crazy woman, Jane Ryan.

"THE COURT: Mr. Harper—

"THE DEFENDANT: No. I want to speak. You're not going to shut me down today. [¶] . . .

"THE DEFENDANT: She's not with Mr. Cannon, get that on the record. Jane Ryan sexually advanced herself to me day one.

"THE COURT: Mr. Harper—

"THE DEFENDANT: She continually violated my 14th and 16th Amendments.

"THE COURT: Mr. Harper, we'll have you come back here tomorrow at 1:30.

"THE DEFENDANT: I think Ms. Mary Knox [the prosecutor] share [sic] with you. I'm pleading guilty to this case to get done with that. You have an attorney, Ms. Ryan, fabricating case after case with me. . . . I'm not coming back tomorrow. I'm pleading to the murder of Jesse Saucedo, who they claimed I murdered, who I have—

"THE COURT: Don't take this down. We'll have you back here tomorrow."

Apparently at the same hearing, defendant attempted to hand a handwritten document to Judge Mockler which stated: "I'm guilty of the murder of Jesse Saucedo. I, the accused, shot the man in the face and neck. I declare under penalty of perjury I did the murder, and no one is making me say this. I am not crazy or have any suicidal thoughts. It's my right to plead how I want, and I plead guilty. Thank you."

b.     In Limine Motion

During in limine motions before Judge John W. Kennedy, who had been assigned to preside over the trial, prosecutor Knox sought a ruling to permit the handwritten document to be offered in evidence. The prosecutor advised

Judge Kennedy that defendant had attempted to give the document to Judge Mockler, who gave it back to defendant.

The trial court held a lengthy in limine hearing, which included reviewing the transcripts of the hearings held on February 25, 2014 and February 26, 2014. At the next court date, Judge Kennedy made a detailed ruling on the record, concluding the document was not an offer to plead guilty under Evidence Code section 1153.[16] The court found there were no plea negotiations going on at the time defendant made the statement and it "was not made in furtherance of plea negotiations because there were none."[17] The document was an unsolicited admission by defendant because he was frustrated with the attorney representing him at the time. The court noted its conclusion was confirmed, in part, by "Judge Mockler's summary refusal to even entertain it. It was a document handed to [deputy district attorney] Ms. Knox and when proffered to Judge Mockler it was entirely refused." In making this ruling, the trial court relied on *People v. Sirhan* (1972) 7 Cal.3d 710, 744–746 (*Sirhan*) [defendant's in-court outburst during trial that he killed the victim with willful and deliberate premeditation not a bona fide offer to plead guilty]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1404 (*Leonard*) [defendant's unsolicited admission of guilt at a change of venue hearing not a bona fide offer to plead guilty; no plea negotiations were underway]; and *People v. Posten* (1980) 108 Cal.App.3d 633, 648 [unsolicited

---

[16] Neither the document nor the transcript of the February 26, 2014 hearing is included in the record.

[17] As a secondary basis for admission, the court concluded that Evidence Code section 1153 was abrogated by the Truth-in-Evidence provision of Proposition 8, and thus did not bar introduction of defendant's statement, which fell under the hearsay exception for an admission by a party.

offer to plead guilty by defendant being transported by officers not made in course of bona fide plea negotiations].)

At trial, the prosecutor offered the handwritten statement into evidence and read it to the jury. Defendant, in response, offered the contents of the February 25, 2014 transcript, which gave context to the document and included his oral outburst to the court.

During closing argument, defendant admitted that he wrote the handwritten statement but disputed the accuracy of its contents and disputed that he had made a confession.

2. *Analysis*

Defendant contends that his handwritten statement was an offer to plead guilty and was thus improperly admitted under Evidence Code section 1153 and section 1192.4.

Under Evidence Code section 1153, a criminal defendant's offer to plead guilty, or a plea that is later withdrawn, is inadmissible in any action or proceeding. Similarly, under section 1192.4, if a defendant's guilty plea is not accepted by the prosecuting attorney and approved by the court, the plea is deemed withdrawn and may not be received in any action or proceeding.

The purpose of the statutes is " 'to promote the public interest by encouraging the settlement of criminal cases without the necessity of a trial.' ([*Sirhan, supra,*] 7 Cal.3d [at p.] 745.)" (*Leonard, supra,* 40 Cal.4th at p. 1404.) "[T]he rule of inadmissibility applies, not merely to admissions of guilt, but also to 'any incidental statements made in the course of plea negotiations . . . .' [Citation.] That construction promotes candor, because '[t]he accused and defense counsel are assured that anything said will not be used against them if the negotiations are unsuccessful.' [Citation.]" (*People v. Crow* (1994) 28 Cal.App.4th 440, 450.) The protections created by these

statutes, however, apply only to those admissions made in the course of "bona fide" plea negotiations. (*Leonard, supra,* at p. 1404.)

Here, the trial court, relying on *Sirhan, supra,* 7 Cal.3d 710 concluded the written statement was admissible because it was not a bona fide offer made during plea negotiations. Defendant argues *Sirhan* is distinguishable because the offer to plead guilty there was made orally and during trial, whereas his was submitted in writing during pretrial proceedings. Nevertheless, defendant's statement was made in frustration during proceedings dedicated to other matters. The dismissiveness of Judge Mockler in refusing to even entertain defendant's statements, either verbally or in written form, confirms that this was not a serious offer made during plea negotiations.

*People v. Hamilton* (1963) 60 Cal.2d 105, cited by defendant, does not help him. There, unlike here, the defendant had met with the prosecutor and "offered to plead guilty if arrangements could be made to assure him a life sentence." (*Id.* at pp. 112–113.) Here, however, defendant did not make a considered effort to negotiate a plea. Instead, he simply made an unsolicited statement that he was guilty, apparently out of the blue. It is telling that defendant did not request any consideration in exchange for the purported "offer," nor did he ever pursue it again after the outburst.

Similarly, *People v. Magana* (1993) 17 Cal.App.4th 1371, also cited by defendant, is distinguishable. The court there upheld the admissibility of the defendant's letter to a fellow gang member asserting that if offered, he would take a plea bargain for 10 years. (*Id.* at pp. 1375–1377.) The court held the letter fell outside the scope of Evidence Code section 1153 because it was made to a third party uninvolved in plea negotiations. (*Id.* at p. 1377.) We have no quarrel with defendant's reliance on *Magana* for the general

44

proposition that Evidence Code section 1153 encourages settlement by encouraging candor in plea negotiations. (*Ibid.*) Defendant, however, ignores that his statement was not made in the course of plea negotiations.

In sum, we agree with the trial court that defendant's written statement declaring he shot Saucedo did not constitute a " 'bona fide offer to plead guilty.' " (*Leonard, supra,* 40 Cal.4th at p. 1404). Also, as no plea negotiations were underway, the written document was an " 'unsolicited admission[ ]' " (*ibid.*) that was not made inadmissible by Evidence Code section 1153 or section 1192.4.[18]

In any event, any error in admitting the document is harmless. There is no reasonable probability defendant would have achieved a more favorable outcome had his admission not been introduced. (*Watson, supra,* 46 Cal.2d at p. 836.) Defendant argued to the jury in closing that the statement should be disregarded. He said it inaccurately described how Saucedo was killed, noting that Saucedo was not shot in the face. He argued that his former attorney, Ms. Ryan, was "fabricating case after case with Mr. Harper," that this case had dragged on, and that he did not want to return the next day so he said he would plead guilty. He pointed out that the court's response was to tell the reporter not to take down what defendant was saying and to decline to accept the plea. He added, "And this was 2014. We're now in 2017. If for some reason that was looked at as a confession, I can assure you there would not be a trial here today." After the court sustained the prosecutor's objection to this last remark, defendant noted, "I think I've made my point."

---

[18] By reason of this holding, we do not further discuss the Attorney General's argument that Evidence Code section 1153 and Penal Code section 1192.4 have been abrogated by Proposition 8 – the Truth in Evidence initiative. (Cal. Const., art. I. § 28, subd. (d).)

Indeed, he had: the note inaccurately stated the facts of the crime; the court proceedings on his case were prolonged, which would cause frustration; and Judge Mockler had not taken defendant's statement seriously. There was never any effort by defendant to change his plea. And, as discussed in detail *ante*, the other evidence of guilt—aside from this document—was strong. Defendant told multiple people that he had killed Saucedo. Castro saw defendant with a gun immediately after hearing the gunshot that killed the victim. Defendant and Bradshaw exchanged texts just prior to the murder and had committed a violent armed robbery together the week before. After the murder, defendant was seen washing his clothes with bleach. On this record, exclusion of the challenged evidence would not have resulted in a more favorable outcome.

### D. *Failure to Properly Instruct the Jury with CALCRIM No. 336*

Defendant contends the trial court erred in refusing to instruct the jury that the testimony of Beck, Beman, and Crossman should be reviewed with caution as set forth in CALCRIM No. 336,[19] which governs the testimony of in-custody informants. He further contends that CALCRIM No. 336 as given with respect to Andrews's testimony was prejudicially flawed with respect to how to assess his testimony.

---

[19] CALCRIM No. 336, provides, in part as follows: "View the (statement/ [or] testimony) of an in-custody informant against the defendant with caution and close scrutiny. In evaluating such (a statement/ [or] testimony), you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits. This does not mean that you may arbitrarily disregard such (statement/ [or] testimony), but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case."

1. *Failure to Designate In-Custody Witnesses as Informants*

Preliminarily, as the Attorney General notes, defendant did not request that Beck, Beman, and Crossman be designated in-custody informants and did not challenge CALCRIM No. 336 in the trial court. Accordingly, these claims are forfeited on appeal. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001 [failure to seek pinpoint instruction forfeits claim on appeal].) In any event, these otherwise forfeited claims have no merit.

"A defendant has the right, on request, to instructions that pinpoint the theory of the defense . . . ." (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.) However,"[a] party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 868.) It is axiomatic that the court has no duty to instruct on an erroneous principle of law.

The requested instruction as to Beck, Beman, and Crossman finds no support in either the record or the law. Section 1127a, subdivision (a), defines an in-custody informant as "a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by the defendant *while both the defendant and the informant are held within a correctional institution*." (Italics added.) Section 1127a, subdivision (b), provides that, when such a person "testifies as a witness, upon the request of a party, the court shall instruct the jury" including that the " 'testimony of an in-custody informant should be viewed with caution and close scrutiny.' " (See *People v. Bivert* (2011) 52 Cal.4th 96, 118-119 (*Bivert*) [CALJIC No. 3.20, the predecessor to CALCRIM No. 336, "adopts the statutory language of section 1127a"]; *People v. Hovarter* (2008) 44 Cal.4th 983, 997 [section 1127a "requires a special jury instruction directing juries to give 'close scrutiny' to the testimony of informants"].)

47

CALCRIM No. 336 reflects the language of section 1127a.  The reason for this instruction is that, as the Supreme Court noted in *Bivert*: "In-custody informant witnesses have no personal knowledge of the crime, but testify that a defendant made an inculpatory statement to them while in proximity in a county jail or state prison, often in exchange for favorable treatment by law enforcement. . . . In-custody informant witnesses testify to a defendant's confession of guilt or admission of criminal behavior, and such evidence, if believed, carries great weight in the determination of guilt.  In order to lessen the possibility of any conviction being based on fabricated testimony, the Legislature offered additional guidance to juries in criminal cases involving in-custody informants." (*Bivert*, at p. 121.)[14]

Beck, Beman, and Crossman did not meet the statutory requirements of in-custody informants because their testimony and statements were not based on statements defendant made to them while they were in-custody with him.  Defendant concedes as much, but nevertheless argues the cautionary protections of CALCRIM No. 336 should extend to these witnesses because they were in custody when they came forward as prosecution witnesses.  Defendant contends Beck, Beman, and Crossman are similar to in-custody informants because both categories of witnesses anticipate some benefit in exchange for their testimony.  Thus, according to defendant, the cautionary instruction should be applicable to them based on their motivation.

We disagree.  To require giving the instruction in connection with the testimony of a percipient witness who incidentally happened to be incarcerated would contravene section 1127a, subdivision (a), which specifically excludes a percipient witness from the definition of an in-custody informant.  (See *Bivert, supra,* 52 Cal.4th at pp. 120–121.)

Additionally, the trial court gave other instructions that adequately advised the jury how to consider the testimony of Beck, Beman, and Crossman, who each had credibility issues, including former gang memberships, drug abuse, and numerous felony convictions. For example, the jury was instructed with CALCRIM No. 226, which listed, among factors to be considered in evaluating witness credibility, whether the witness's testimony was influenced by bias or prejudice, whether the witness had been convicted of a felony, and whether the witness was promised immunity or leniency in exchange for testimony. Additionally, CALCRIM No. 316, specifically told the jury to consider whether the witness had been convicted of a felony or committed a crime or other misconduct in evaluating credibility. Notably, even without the instruction for which he now advocates, defendant was free to argue to the jury that the testimony given by Beck, Beman, and Crossman should be viewed with caution because of their self-interest, and indeed defendant did just that. During closing argument, defendant told the jury that "when someone snitches, it doesn't mean that they're actually telling on somethin' that is true." He explained, "Sometimes people, and you've heard testimony of this, people will say things and do things like this to get what they call leniency for themselves." He continued: "You've heard witnesses who were in custody testify they don't get along with Mr. Harper; they don't like Mr. Harper; they've heard this about Mr. Harper; they've heard that about Mr. Harper; Mr. Harper told them he did this and that to somebody in a murder case. [¶] Now, one has to ask themselves, why would Mr. Harper tell someone he doesn't get along with anything? And what motive would someone who doesn't get along with Mr. Harper have in testifying against Mr. Harper?"

49

In sum, we find no error in the trial court's refusal to give CALCRIM No. 336 with respect to the testimony of Beck, Beman, and Crossman.

> 2. *Alleged Failure to Instruct the Jury on How to Evaluate Andrews's Testimony*

Defendant contends that CALCRIM No. 336, as given, was prejudicially flawed because (1) it was inconsistent about whether Worsten Andrews was an in-custody informant or whether that was an issue for the jury to decide, and (2) it failed to tell the jury Andrews's testimony had to be corroborated not only to convict defendant for murder, but also to find the special circumstance and enhancement allegations true.

The instruction at issue read, in pertinent part, as follows: "Worsten Andrews is an in-custody informant. [¶] View the statements or testimony of an in-custody informant against the defendant with caution and close scrutiny. In evaluating such statements or testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits. This does not mean that you may arbitrarily disregard such statements or testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case. [¶] An in-custody informant is someone, other than a codefendant, percipient witness, accomplice, or coconspirator, whose statements or testimony are based on statements a defendant allegedly made while both the defendant and the informant were held within a correctional institution. *If you decide that a declarant or witness was not an in-custody informant, then you should evaluate his or her statements or testimony as you would that of any other witness.* [¶] You may not convict the defendant of Murder based on the statements or testimony of that in-custody informant alone. Nor may you find an allegation true based on the statements or testimony of that in-custody informant alone." (Italics added.)

50

Defendant argues, and the Attorney General concedes, that the italicized language should not have been given. Rather, it was designed for use in situations where the jury is to determine whether a person qualifies as an in-custody informant. That was not the case here. Andrews was an in-custody informant as a matter of law, and the instruction clearly stated so.

The Attorney General argues that notwithstanding the error, there is no reasonable likelihood the jurors concluded Andrews's testimony did not require corroboration. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70–75; *People v. Kelly* (1992) 1 Cal.4th 495, 525.) We agree. The jury was advised in numerous instances that Andrews was an "in-custody informant." Despite the inconsistency in the instruction as given, it unambiguously starts out with the statement that "Worsten Andrews is an in-custody informant." The jury was further instructed with CALCRIM No. 301, which stated, "Except for the testimony of Worsten Andrews, and the statements of an accomplice, which require supporting evidence, the testimony of only one witness can prove any fact." Additionally, during closing argument, the prosecutor told the jury that Andrews "is an in-custody informant, he fits the legal definition, and that's whether you—a witness gains the only information they have about a crime from a defendant, and they're both in custody together. And so *there are very special rules that apply to Worsten Andrews, so he has to be corroborated.*" (Italics added.) And, when the prosecutor objected to defendant's characterization of Beck and Beman as informants in his closing statement, the court advised the jury, "*As I've instructed the jury, the legal definition of an in-custody informant applies only to Worsten Andrews as a legal definition.* [¶] . . . [¶] So the corroboration requirement does not apply to the other people he's naming, only to Mr. Andrews and to any statements from Mr. Bradshaw . . . ." (Italics added.)

Accordingly, we conclude there is no reasonable likelihood the jury would have been led astray by the mistakenly included language in CALCRIM No. 336.

Defendant next complains that the instruction as given failed to tell the jury that the corroboration requirement for Andrews's testimony applied not only to the murder charge but also to the special circumstance and enhancement allegations. His argument is without merit. The challenged instruction expressly told the jury: "You may not convict the defendant of Murder based on the statements or testimony of that in-custody informant alone. *Nor may you find an allegation true based on the statements or testimony of that in-custody informant alone.* [¶] You may use the statements or testimony of an in-custody informant only if: [¶] 1. The statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the statement or testimony; [¶] AND [¶] 3. That supporting evidence *connects the defendant to the commission of the crime or to the allegations.*" (Italics added.)

Although the instruction broadly referred to "allegations" and did not specify "special circumstances" or the other enhancements, the jury received numerous instructions that delineate these allegations. (See CALCRIM No. 704 [discussing "special circumstance allegation"]; CALCRIM No. 1401 [discussing "the additional allegation that the defendant committed the crime for the benefit of . . . a criminal street gang"]; CALCRIM No. 3149 [discussing "the additional allegation that the defendant personally and intentionally discharged a firearm during that crime causing great bodily injury or death"]; CALCRIM No. 1402 [discussing the "additional allegation" regarding gang-related firearm enhancement].) In considering the instructions as a whole, we conclude there is no reasonable likelihood the jury was confused or led

astray by the failure to delineate the specific allegations in CALCRIM No. 336. (See, e.g., *People v. Brooks* (2017) 3 Cal.5th 1, 76 [holding failure to cross-reference definitions of arson and kidnapping in felony-murder case did not warrant reversal].)

Further, Andrews's testimony relating to the gun use enhancement was also substantially corroborated. He testified that defendant told him he brought a gun when he went to confront the victim and that he shot him. Castro testified that when she emerged from the bedroom after hearing the gunshot, she saw defendant with a gun in his waistband. Beman testified that defendant told him he shot the victim. Additionally, just hours before the murder, defendant was seen with a gun.

In light of this evidence, any error in the instruction regarding the corroboration requirement with respect to the gun use and special circumstance allegations was harmless.

## E. *Refusal to Order Witnesses to Refrain from Discussing Case*

Defendant contends the court violated his right to a fair trial by refusing to order all witnesses not to discuss their testimony with one another.

### 1. *Background*

Prior to trial, defendant's trial counsel filed a motion asking the court to "order all witnesses to not talk with each other or others, excepting the deputy district attorney and defense counsel, and their respective investigators, during the pendency of the trial regarding matters pertaining to their testimony, including questions asked and answers given." The motion was unaccompanied by any argument or legal authority.

At the in limine hearing, the trial court granted the defendant's routine motion in limine to exclude non-testifying witnesses from the courtroom

under Evidence Code section 777. Defense counsel, however explained that she also wanted to have the witnesses "admonished not to speak of their testimony with one another, not [just a] silence order." The court asked if counsel had any legal authority supporting such an "out of the ordinary" request. Counsel replied that she believed it was within the court's inherent power to make such an order, but "[i]f the Court wants me to find authority, I can do so." The court responded, "Well, my general practice is to refer me to what the authority is before ruling. If it's—it may be discretionary, but there may be factors to consider. [¶] So I would appreciate any authority on that and I'll get back to that." Defense counsel responded, "Reserved."

2.    *Analysis*

Preliminarily, defendant concedes on appeal that he never obtained a ruling on the motion. Yet, he claims the trial court erred in its "refusal" to give this "commonly given instruction[.]" This claim fails. Defendant's failure to secure a ruling forfeits the claim on appeal. (*People v. Braxton* (2004) 34 Cal.4th 798, 813 ["[A] party may not challenge on appeal a procedural error or omission if the party acquiesced by failing to object or protest under circumstances indicating that the error or omission probably was inadvertent"].) In any event, this otherwise forfeited claim fails on the merits.

As discussed *ante*, trial courts have broad discretion to control the conduct of a criminal trial. (§ 1044.) Defendant implicitly concedes there is no rule requiring the court to order witnesses not to speak to one another about their testimony during trial. He also acknowledges that even motions to exclude witnesses from the courtroom at trial, which are routinely granted, may be denied at the trial court's discretion. (*People v. Lariscy* (1939) 14 Cal.2d 30, 32; *People v. Valdez* (1986) 177 Cal.App.3d 680, 687; Evid. Code,

54

§ 777, subd. (a) ["[t]he court *may exclude* from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses"]; see *People v. Young* (1985) 175 Cal.App.3d 537, 541 [noting that by statute, witness exclusion during the preliminary examination is, on motion of either party, a matter of right, whereas the court retains discretion to deny exclusion at trial, where witness separation is less crucial].)

Defendant argues the court abused its discretion in refusing to protect him from the possibility of the prosecution's witnesses talking to each other to "bolster their stories and/or memories, or coordinate their testimony and thus shore up the weaknesses in their testimony." However, "abuse of discretion is not presumed from a silent record, but must be clearly shown by [defendant]." (*People v. Preyer* (1985) 164 Cal.App.3d 568, 574; see *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

Here, defendant points to nothing in the record to support his claims, but instead relies on generic assertions of likely collusion "based on the fact that numerous civilian witnesses had relationships with each other, including their intertwined history of criminal behavior and drug use." He further argues "the prosecution's group of witnesses were more likely to have memory problems and to be suggestible than witnesses in most criminal trials . . . where . . . witnesses are strangers to each other." Although some of the witnesses in this case knew one another, the trial court had no reason to believe they would collude with one another to defendant's detriment, and defendant's counsel, who requested the order, offered no evidence or argument to support such a claim. Defendant's conjecture does not support his claim of error.

55

*People v. Griffin* (2004) 33 Cal.4th 536, cited by defendant, does not help him. There, the Supreme Court concluded the trial court did not abuse its discretion in permitting the murder victim's mother and sister to remain in the courtroom during the penalty phase of the defendant's capital trial even though they would be testifying. (*Id.* at pp. 570–571, 574.) Nothing before the trial court at the time it made its ruling suggested that the presence of these witnesses posed a substantial risk that either would craft her own testimony, or cause any other witness to do so. (*Id.* at p. 574.) Defense counsel in *Griffin* asserted only that such a risk existed, but an assertion of this sort is insufficient to support a claim that the trial court abused its discretion. (*Ibid.*; see also *People v. Lee* (2015) 242 Cal.App.4th 161, 180 [no abuse of discretion in denying defense request to exclude the victim's civil attorney from attending the trial where nothing before the court suggested a substantial risk that the attorney would share information with the victim about the testimony of other witnesses].)

Likewise here, defendant points to nothing before the trial court at the time of his request suggesting any of the witnesses would discuss their testimony with one another. Subsequent events suggested they did not. Alicia Hammond was friends with Joey Gaeta and Robert Lexer at the time of Saucedo's murder in 2008. By 2017, when the case went to trial, Hammond, who had been a drug user at the time of the crime, had been sober for over five years and was no longer part of that circle. Lexer did not remember Hammond and had not seen Gaeta in many years. Vera moved shortly after the murder and had been sober for eight years. She remembered Lexer, but not Gaeta or Hammond.

Weathers and Waren clearly did not collude: Weathers was an uncooperative witness, whereas Waren testified to seeing defendant with a

56

gun a week before the murder and seeing him wash his clothes with bleach in the morning right after the murder. Contrary to defendant's assertion, Andrews and Beman did not know one another. In short, defendant failed to establish an abuse of discretion.

Finally, to the extent the court abused its discretion by not granting defendant's request, there is no reasonable probability defendant would have achieved a more favorable result absent the error. (*People v. Hernandez* (2011) 51 Cal.4th 733, 745; *Watson, supra*, 46 Cal.2d at p. p. 836.) First, there is no evidence any of the witnesses discussed their testimony with any other witness and did so to defendant's detriment. Second, as discussed *ante*, the evidence of defendant's guilt was strong.

## F. *Cumulative Error*

We reject defendant's claim of cumulative error. Any harmless errors we have identified did not, either individually or cumulatively, prejudice him. Defendant was entitled to a fair trial, not a perfect one. (*People v. Cain* (1995) 10 Cal.4th 1, 82.)

## G. *Failure to Obtain Waiver of Jury Trial on Prior Convictions*

Defendant contends he was denied his right to a jury trial on the prior conviction allegations because the trial court discharged the jury before obtaining a waiver from him. He argues this amounts to structural error. We disagree.

### 1. *Background*

An information alleged that defendant suffered two prior kidnapping (§ 207, subd. (a)) convictions that occurred on July 16, 1998. Prior to trial on the charged offenses, defendant's defense counsel (Anne Beles) requested bifurcation of the trial on the prior conviction allegations. Defense counsel

57

advised the court: "We did in the last trial[20] waive jury on that. I did not discuss that waiver with Mr. Harper before this morning's date, but I am assuming that it is likely we would waive jury on the priors like we did last time." In granting bifurcation of the prior convictions, the trial court stated that it would "take a jury waiver when that becomes appropriate assuming that the defendants wish to waive jury on that." The minute order memorializing the in limine hearing states that "Both counsels make a motion to bifurcate the defendant's [*sic*] prior convictions. They have not waive[d] a jury trial on the priors." So far as the record shows, defendant did not explicitly waive a jury, and his defense counsel never again indicated she was or defendant was still willing to do so.

By the time the jury returned its verdict on August 2, 2017, defendant was representing himself. After accepting the verdict and polling the jurors at defendant's request, the court discharged the jury.

At the November 3, 2017 sentencing, the trial judge asked the prosecutor about the prior allegations, stating that he did not remember if they had taken a jury waiver or addressed them previously. The prosecutor responded that she had moved defendant's prior convictions packet into evidence. The court located the packet, which had been submitted without objection in the trial on the charged offenses. The court then asked defendant if he had any comments in relation to the prior convictions. Defendant responded, "I think the Court knows what it's doing. Court knows what it's done all along." After confirming that both parties had submitted on the issue, the court found the prior conviction allegations true.

---

[20] Defendant had gone to trial on a different case (Case No. A152284, described above in fn. 3) the previous month with the same prosecutor and defense counsel.

2.    *Analysis*

The right to have the jury decide the truth of a prior conviction allegation stems from section 1025, subdivision (b), not from the jury trial provision of article I, section 16 of the California Constitution or the Sixth Amendment of the United States Constitution.  (*People v. Vera* (1997) 15 Cal.4th 269, 277.)  Thus, a defendant may forfeit a claim that his right to a jury trial on a prior conviction allegation was improperly denied or improperly waived.  (*Id.* at p. 278 ["[T]he deprivation of the statutory right to jury trial on the prior prison term allegations does not implicate the state or federal constitutional right to jury trial.  Absent an objection to the discharge of the jury or commencement of court trial, defendant is precluded from asserting on appeal a claim of ineffectual waiver of the statutory right to jury trial of prior prison term allegations"]; *People v. Grimes* (2016) 1 Cal.5th 698, 737–738 [defendant forfeited a claim of involuntary waiver of jury trial on prior conviction allegations based on failure to object in the trial court].)  Here, by failing to object, defendant forfeited any claim that the trial court improperly denied him his right to a jury trial without first advising him of his rights and taking a waiver.  That defendant was representing himself at the time the trial court discharged the jury is of no moment.  Prior to granting defendant's motion for self-representation, the trial court advised him about the perils of self-representation, and expressly advised that he would be held to the same standards as an attorney; defendant confirmed that he understood the risks of self-representation.

Even assuming an error with respect to defendant's limited right to a jury trial of the prior conviction allegations, the error is subject to the harmless error analysis under the *Watson* standard.  (*People v. Epps* (2001) 25 Cal.4th 19, 29.)  The California Supreme Court explained in *Epps* that

59

where the right to jury trial is created by statute, and not the Constitution, the erroneous denial of a jury trial is subject to the *Watson* test of harmless error. (*Ibid*.) Here, defendant never claimed he was not the person who committed the prior offenses, and his identity as that person was established by certified copies of his section 969b prison packet. Given the record before us, it is not reasonably probable that a different result would have resulted had the prior conviction allegations been tried before a jury.

## H. *Sentencing*

Defendant argues that the trial court erred in several ways in imposing this sentence. The Attorney General concedes that there was sentencing error. The parties, however, disagree about how the sentence should be calculated.

### 1. *Overview of the Sentencing Issues*

The trial court imposed a sentence on the murder conviction, count 1 of life without parole (LWOP), plus 116 years to life. That sentence had the following components: a life sentence without parole for the murder with special circumstances (§§ 187; 190.2); a consecutive term of 75 years to life (25 years tripled under § 667, subd. (e)(2)(A)(i))[21]; a consecutive firearm enhancement of 25 years (§ 12022.53, subd. (d)); two five-year consecutive prior serious felony enhancements based on defendant's two prior kidnapping convictions (§ 667, subd. (a) [10 years]); and two three-year consecutive prior prison term enhancements (§ 667.5 [6 years]).

In addition, the court imposed a 45-year minimum parole eligibility (15 years tripled under § 667, subd. (e)(2)(A)(i) on the street gang enhancement.

---

[21] The prosecutor requested this specific sentencing structure.

Defendant argues the proper sentence for count 1 should have been LWOP, plus 25 to life (§ 12022.53, subd. (d)), plus one five-year term under 667, subdivision (a) for the kidnapping priors that were prosecuted together in case number 05-9719337, for an aggregate term on the enhancements of *30* years to life (not 116 years to life).

Defendant also argues the court erred in imposing a minimum parole eligibility period because he was sentenced to life *without* parole. He requests the matter be remanded with directions for the trial court to exercise its discretion to strike the consecutive 25-year firearm enhancement, which is no longer mandatory as it was at the time of his sentencing. (See § 12022.53, subd. (h).)

The Attorney General concedes there were various sentencing errors that require modification. In the original appellate briefing in this case before we issued our now vacated opinion, the proper sentence, according to the Attorney General, should be *three* terms of LWOP for the murder conviction with special circumstances, plus *43* years to life, comprised as follows: one 25-year-to-life term for the firearm enhancement (§ 12022.53, subd. (d)); one five-year term for the prior kidnapping offenses (§ 667, subd. (a)); one three-year term for the prison priors (§ 667.5); and a 10-year term for the gang enhancement under section 186.22, subdivision (b)(1)(C). In supplemental briefing since the Supreme Court remanded this appeal back to us in light of Assembly Bill 333, the Attorney General agrees that the gang enhancement under section 186.22 must be vacated.

We address each of the issues raised with defendant's sentence and the statutes that are implicated in each.

## 2. *Sentencing Under Three Strikes Law*

Defendant was convicted of first degree murder (§ 187) with special circumstances (§ 190.2, subd. (a)).  Under section 190, subdivision (a), the punishment for first degree murder is "death, imprisonment in the state prison for life without the possibility of parole, *or* imprisonment in the state prison for a term of 25 years to life."  (Italics added.)

Here, the trial court sentenced defendant to *both* an LWOP term and 75 years to life (25 years to life tripled under § 667, subd. (e)(2)(A)(i)) for the same count of murder.  Defendant argues, and the Attorney General concedes, that the proper sentence for the murder conviction in this case was LWOP, since the prosecution did not seek the death penalty and the special circumstances allegation was found true.  The disagreement lies in the application of the Three Strikes Law (§§ 667, subds. (b)–(j); 1170.12) to the LWOP term.

Under the Three Strikes Law a court triples the sentence otherwise mandated for a "serious" or "violent" felony if it is a defendant's third such conviction.  (§§ 667, subd. (e)(2)(A)(i), 1170.12, subd. (c)(2)(A)(i)).)  Specifically, the law provides: "If a defendant has two or more prior serious or violent felony convictions . . . that have been pled and proved, the term for the current felony conviction shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the *greatest* of: [¶] (i) *Three times the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior serious or violent felony convictions.*  [¶] (ii) Imprisonment in the state prison for 25 years.  [¶] (iii) The term determined by the court pursuant to Section 1170 for the underlying conviction[.]"  (§§ 667, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A), italics added.)

62

As the parties recognize, courts are split on whether this tripling provision applies when the "term otherwise provided as punishment" is life without parole. Relying on *People v. Smithson* (2000) 79 Cal.App.4th 480 (*Smithson*), *People v. Coyle* (2009) 178 Cal.App.4th 209 (*Coyle*) and *People v. Mason* (2014) 232 Cal.App.4th 355 (*Mason*), defendant contends that the portion of the Three Strikes Law that provides for tripling sentences does not apply to his LWOP sentence.

The Attorney General relies on another case, *People v. Hardy* (1999) 73 Cal.App.4th 1429 (*Hardy*), which held that the Three Strikes Law applies to double or triple an LWOP sentence, on the theory that such a sentence fulfills the intent of the Three Strikes Law to ensure longer prison terms (i.e., *three* terms of life without the possibility of parole) for those who fall within its reach. (*Id.* at p. 1433.) As far as we are aware, no published case follows *Hardy's* interpretation.

In *Hardy,* Division Two of the Second Appellate District held that the law did not "expressly describe[ ] how a second strike defendant is to be sentenced if the current offense is one for which a defendant with no prior strike would receive a sentence of life without possibility of parole," but held that the "stated purpose" of the law meant that the law also requires that LWOP sentences be doubled. (*Hardy, supra,* 73 Cal.App.4th at pp. 1433–1434.)

Defendant argues that *Hardy* is an "outlier"[22] and urges us instead to follow *Smithson*, *Coyle*, and *Mason*. These cases hold that the statute excludes LWOP sentences from being doubled or tripled; the Three Strikes Law permits doubling (§ 667, subd. (e)(1)) or tripling (§ 667, subd. (e)(2)) only

___

[22] We have not found any published cases that follow *Hardy's* interpretation of the Three Strikes Law.

of the determinate term or minimum term for an indeterminate term. (*Smithson, supra,* 79 Cal.App.4th at p. 503; *Coyle, supra,* 178 Cal.App.4th at p. 219; *Mason, supra,* 232 Cal.App.4th at pp. 368–369.) Since an LWOP sentence is an indeterminate sentence with no minimum term, those courts found the Three Strikes Law does not apply. (*Smithson, supra,* at pp. 503–504; *Coyle, supra,* at p. 219; *Mason, supra,* at p. 368.)

We conclude that *Smithson*, *Coyle*, and *Mason* are the better reasoned decisions. A leading sentencing treatise adopts this view, too. (See Couzens, et al., Cal. Practice Guide: California Three Strikes Sentencing (The Rutter Group 2020) ¶ 7:3 [noting that in the absence of Supreme Court guidance resolving the issue, *Smithson* and *Coyle* seem better reasoned].)

Accordingly, we reject the Attorney General's position that defendant should have been sentenced to three terms of life without the possibility of parole. The legal sentence for the single conviction of murder here is a single LWOP term. We next turn to the enhancements.

3. *Prior Serious Felony and Prior Prison Terms Enhancements*

As we have described, the information alleged that defendant suffered two prior serious felony convictions and two prior prison terms in connection with a1997 kidnapping. The trial court found the allegations to be true and sentenced defendant to two five-year prior serious felony enhancements (§ 667, subd. (a)) and two three-year prior prison term enhancements (§ 667.5, subd. (a)).

Defendant asserts that the trial court erred in imposing two five-year prior serious felony enhancements (§ 667, subd. (a)) and two three-year prior prison term enhancements (§ 667.5, subd. (a)) on account of the same two prior kidnapping convictions. Defendant makes a multi-part argument: First, he argues that because both prior kidnapping charges were brought

and tried in the same case, the trial court should have imposed only *one* five-year prior serious felony enhancement (§ 667, subd. (a)).  Second, he argues that the trial court erred in relying on the same prior convictions to impose *both* the prior serious felony enhancements (§ 667) and the prior prison term enhancements (§ 667.5).  Asserting that only the greater enhancement should be imposed, defendant argues the two three-year prior prison term enhancements should be stricken.

The Attorney General agrees with the first argument that one five-year prior serious felony enhancement (§ 667, subd. (a)), must be stricken because the kidnapping convictions on which those enhancements rested were not brought and tried separately.  Based on the same reasoning, the Attorney General further concedes that one of the three-year prior prison term enhancements (§ 667.5) must also be stricken because defendant served a *single* period of incarceration for these two kidnapping convictions.  However, the Attorney General reasons that because there were two kidnapping convictions, defendant could still be punished for one prior kidnapping conviction with a five-year enhancement for a prior serious felony enhancement under section 667, and punished for the *other* prior kidnapping conviction with a three-year enhancement for a three-year prior prison term under 667.5.  We disagree with the Attorney General's reasoning.

"California law makes plain an intent that certain recidivism be severely punished." (*People v. Jones* (1993) 5 Cal.4th 1142, 1152-1153.)  However, our high court stated: "the voters did not specify that enhancements under sections 667 and 667.5 were both to apply to the same prior offense; rather, subdivision (b) of section 667 and the rules of statutory construction lead us to the opposite conclusion." (*Id.* at p. 1153.)  Thus, a particular prior conviction cannot serve as the basis for *both* enhancements.

"[W]hen multiple statutory enhancement provisions are available for the same prior offense, one of which is a section 667 enhancement, the greatest enhancement, but only that one, will apply." (*Id.* at p. 1150.) Thus, because the prior prison term enhancements imposed were based on the same conviction that served as the basis for defendant's prior serious felony enhancement, the two prior prison term enhancements must be stricken.

### 4. *Gang Enhancement*

Defendant originally argued that the trial court erred in imposing a minimum parole date pursuant to section 186.22, subdivision (b)(5) because his term of life without parole contains no anticipated parole date. The Attorney General agreed that defendant should not have been sentenced under section 186.22, subdivision (b)(5). The Attorney General contended that defendant should instead receive an additional 10-year gang enhancement under section 182.22, subdivision (b)(1)(C). Because we are vacating the true finding on the gang enhancement, these sentencing issues are now moot.[23]

---

[23] Without expressing any opinion as to whether the gang enhancement should be retried or the likelihood a jury would reach a true finding in light of Assembly Bill 333, we note for the guidance of the trial court and parties that it was error to impose the minimum parole term at the original sentencing. Section 186.22, subdivision (b) establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang. Section 186.22, subdivision (b)(1)(C) imposes a 10-year enhancement when such a defendant commits a violent felony. However, subdivision (b)(5) provides : "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

Here, the trial court applied the minimum parole eligibility period under section 186.22, subdivision (b)(5), which it then tripled under the Three Strikes Law. In the original briefing on appeal, defendant contended and the

## 5.    *Firearms Enhancement*

The jury found defendant personally and intentionally discharged a firearm, proximately causing great bodily injury and death in the commission of count 1.  As a result, the trial court imposed an enhancement of 25 years to life consecutive to life without parole on count 1.  (§ 12022.53, subdivision (d) (firearm enhancement).)

At the time of defendant's sentencing, the trial court had no discretion to strike this firearm enhancement.  (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 424 (*McDaniels*).)  Section 12022.53, subdivision (h), which became effective on January 1, 2018, now provides that "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing,

---

Attorney General agreed that the trial court erred in imposing the 45-year-to-life minimum parole eligibility period term (§ 186.22, subd. (b)(5)) on count 1, because the sentence on that count was life without the possibility of parole. We agree it was error to impose a minimum parole eligibility term (and error to treble it), and it must not be imposed in the event the gang enhancement is retried and found true.  (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1009-1010 [noting former section 186.22, subdivision (b)(3), now section 186.22, subdivision (b)(5), imposes a minimum parole eligibility term of 15 years that is "understood to apply to *all* lifers, except those sentenced to life without the possibility of parole"].)

In the parties' original briefing on appeal, the second issue in connection with the gang enhancement was the Attorney General's alternate claim that a 10-year consecutive enhancement should be imposed under section 186.22, subdivision (b)(1)(C).  The application of this subdivision was not raised in the trial court.  The Attorney General raised this fallback position on appeal citing only the statutory language, and neither party adequately addressed the application of a 10-year gang enhancement specified in section 186.22, subdivision (b)(1)(C) to a life without the possibility of parole sentence.  For that reason we decline to address it further.

strike or dismiss an enhancement otherwise required to be imposed by this section."

Defendant asks us to remand to the trial court to decide whether to strike the firearm enhancement under section 12022.53, subdivision (h). (See *McDaniels*, *supra,* 22 Cal.App.5th at p. 424 [the discretion conferred by section 12022.53, subdivision (h) applies retroactively to nonfinal judgments].) The Attorney General does not address the merits of this argument; he instead asserts that defendant did not challenge this component of his sentence. In his reply, defendant contends he raised the issue "to the extent [he] requested remand."

Although defendant does not include a separate argument on the firearm enhancement in his opening brief, we nevertheless conclude he has preserved the issue in his request for remand. We further conclude that because the record contains no clear indication that, had it been an option, the trial court would not have exercised its discretion to strike the firearm enhancement, the firearm enhancement may be raised on remand. (*McDaniels*, *supra*, 22 Cal.App.5th at pp. 427–428.) We express no opinion how the court should exercise its discretion on remand.

## DISPOSITION

We reverse the true finding on the gang enhancement allegation on count 1 (§ 186.22, subd. (b)) and remand to the trial court with directions to (1) give the People an opportunity to retry the enhancement under the law as amended by Assembly Bill 333; and (2) if the People elect not to retry defendant, or at the conclusion of retrial, to impose an appropriate sentence.

We remand the matter for resentencing consistent with this opinion. On remand, the trial court is directed to strike the following components of defendant's sentence as to count 1: 1) the 75-year-to-life term (25-year base

tripled) imposed under section 667, subdivision (e)(2)(A)(i); 2) one five-year prior serious felony enhancement imposed under section 667, subdivision (a); 3) both of the three-year prior prison term enhancements imposed under section 667.5, subdivision (a); and 4) the 45-year minimum parole eligibility term imposed under section 186.22, subdivision (b)(5).  The trial court is further directed to determine whether to exercise its discretion under section 12022.53, subdivision (h) to strike the firearm enhancement.  In all other respects, the judgment is affirmed.  Following resentencing, the trial court is ordered to amend the abstract of judgment and serve all appropriate agencies to reflect these changes.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P.J.


_____
Stewart, J.


A153332, *People v. Harper*

70